AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 2:20-mj-441 |
| All information associated with Facebook user ID | ) | |
| Kabo Mccabe / Facebook user ID number | ) | |
| 100047166105046 that is stored at Facebook | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached hereto and incorporated herein by reference.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846, 841 | Conspiracy to Possess with the Intent to Distribute Controlled Substances |

The application is based on these facts:

See Affidavit of DEA SA Noah Bookman, which is attached hereto and incorporated herein by reference.

☒ Continued on the attached sheet.

☒ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Noah Bookman*
*Applicant's signature*

Noah Bookman, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 24, 2020

_____

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH WARRANT TO FACEBOOK FOR RECORDS RELATING TO FACEBOOK ID Kabo Mccabe / FACEBOOK USER ID NUMBER 100047166105046 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No.  2:20-mj-441 _____ _____ **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Noah Bookman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841 have been committed. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

1

3.     I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since February 2015. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

4.     Prior to being employed by the DEA, I graduated from the Hocking College Ohio Peace Officer Training Academy located in Nelsonville, Ohio, in June 2005. I received approximately 16 weeks of specialized police training on topics including but not limited to search and seizure, investigative techniques, testifying in court, evidence collection, interview and interrogation, and controlled substance identification. I also received an Associate's Degree from Hocking College in Police Science. From April 2005 to January 2007, I was employed by the Hocking County Sheriff's Office, Patrol Bureau. From January 2007 to June 2014, I was employed by the City of Lancaster Police Division and I was assigned to the Patrol Bureau. From June 2012 to September 2014, I was assigned to the Fairfield-Hocking Major Crimes Unit. In September 2014, I was hired by the DEA. In February 2015, I graduated from the DEA Academy and reported directly to the Columbus District Office.

5.     During the course of my law enforcement career, I participated in numerous investigations involving narcotics trafficking. I received specialized training in narcotics trafficking and money laundering from the DEA and I have personally been involved in investigations concerning the possession, manufacture, transportation, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. I have experience in debriefing defendants, participating witnesses, cooperating individuals, and other persons who have personal knowledge and experience regarding the amassing, conversion,

2

transportation, distribution, and concealment of records and proceeds of trafficking in controlled substances. As a Special Agent and a police officer, I participated in the execution of numerous search warrants at the residences and businesses of narcotics traffickers, safe houses, and supply houses. I also participated in numerous arrests for drug-related offenses and I have drafted multiple search warrants. As a Special Agent, I participated in investigations targeting individuals and organizations trafficking heroin, fentanyl, cocaine, cocaine base ("crack"), marijuana, methamphetamine, and other controlled substances, as defined in 21 U.S.C. § 801.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATIVE BACKGROUND

7.     On April 2, 2020, deputies with the Hocking County Sheriff's Office responded to 13502 Drummond Drive in Logan, Ohio, which is within the Southern District of Ohio, in regards to a possible drug overdose. Upon arrival, deputies located Christopher McCabe, who was unresponsive, in his bedroom. Christopher McCabe was later pronounced deceased by the Hocking County Coroner. It was determined that Christopher McCabe lived with his mother, Kimberly McCabe, at the residence. Kimberly McCabe provided the deputies consent to search Christopher McCabe's bedroom. During the search of the bedroom, deputies located and seized numerous narcotics-related items, including suspected heroin. Deputies also located and seized a cellular device, which was identified by Kimberly McCabe as Christopher McCabe's cellular device. The items seized during the search were placed into evidence.

8.     On May 7, 2020, Mary E. Goolsby, M.D. Forensic Pathologist Deputy Coroner, Montgomery County, Ohio stated "it is my opinion that the cause of death of Christopher McCabe is: Multiple drug intoxication (fentanyl, heroin and methamphetamine), with a history of drug abuse contributing."

9.     In May 2020, Kimberly McCabe provided the passcode to Christopher McCabe's cellular device that was located on April 2, 2020. Later investigators conducted an interview with Kimberly McCabe at the Hocking County Sheriff's Office. Kimberly McCabe stated she believed Christopher McCabe's narcotics-related conversations were conducted over Facebook, a social media platform. Kimberly McCabe provided Christopher McCabe's Facebook username to investigators as Kabo Mccabe. Investigators observed the Facebook profile picture on the Facebook page "Kabo Mccabe" and it appears to be a picture of Christopher McCabe. It was determined that Facebook user ID number 100047166105046 corresponds to this Facebook page, Kabo Mccabe.

10.     Prior to Kimberly McCabe's interview, a Hocking County Sheriff's Office detective extracted the data from the cellular device. No Facebook messages from the Facebook Messenger application were included on the extraction. After speaking with Kimberly McCabe and learning that Christopher McCabe used the Facebook Messenger application to communicate about drug purchases, investigators retrieved the cellular device from the evidence room and conducted a physical examination of the cellular device. While conducting the physical examination, Facebook messages sent over the Facebook Messenger application were found in the cellular device; therefore, none of the Facebook messages sent over the Facebook Messenger application that are in the cellular device were included in the extraction report. It is believed that the program used to perform the extraction does not have the capability to extract Facebook

messages from the Facebook Messenger application. Because drug trafficking evidence was found in the Facebook Messenger application for the Facebook page Kabo McCabe / Facebook user ID number 100047166105046, a preservation request was sent to Facebook for this account on May 19, 2020.

11.     During the physical inspection of the cellular device, investigators observed conversations on Christopher McCabe's Facebook Messenger application (username Kabo Mccabe) having a conversation with an individual utilizing the username Miranda. Below is part of a message thread between Kabo Mccabe and Miranda over a several hours period, on April 1, 2020:

| | |
|---|---|
| Kabo Mccabe: | I need know b4 i leave |
| Miranda: | I know someone else who has shit<br>And it's good |
| Kabo Mccabe: | fuck man idk what do |
| Miranda: | what do you mean |
| Kabo Mccabe: | Let me seehow much im getting.  I got u regardless tho |
| Miranda: | You said that the you had a couple bucks too and the night we dropped u off n picked u up from calico and I didn't get anything. It's whatever but I'll see lol |
| Kabo Mccabe: | I got u lol<br>I only got nuff cpl bags |
| Miranda: | Better than none. |
| Kabo Mccabe: | What?<br>I need go alan house |
| Miranda: | U finally talk to him |
| Kabo Mccabe: | yea |
| Miranda: | Kk |

5

| | |
|---|---|
| Kabo Mccabe: | Can u pmu |
| Miranda: | We have to make it quick<br>Leaving my<br>House now |
| Kabo Mccabe: | u know where I am? |
| Miranda: | Where are you |
| Kabo Mccabe: | Calico ridge<br>I need k ow nig |
| Miranda: | You're gonna have to hold on and I got a find out what is going on exactly like I don't I don't know I stressing out<br>What is the address |
| Kabo Mccabe: | Bobs house<br>17087 Calico ridge |
| Miranda: | Ok<br>You said you are getting me a bag too? |
| Kabo Mccabe: | I have hurry tho.  Ive got to get home n I got 50$ rn |
| Miranda: | Ok I'm comin<br>*Miranda called Kabo Mccabe through the Messenger app.*<br>So technically you have $30? |
| Kabo Mccabe: | Ive got 55 |
| Miranda: | Ok I thought $20 was gonna go to Alan ok I'm contacting my girl bc the shit she has is good. |
| Kabo Mccabe: | If u want pick them up 1st that's fine I have b home sap tho |
| Miranda: | who is them? Lol<br>My girl |
| Kabo Mccabe: | Yea whoever it is<br>Whats verdict<br>? |

6

| Miranda: | Chris I'm trying my hardest to contact ppl believe me I haven't had shit I'm calling everyone |
| Kabo Mccabe: | Hey u comin |
| Miranda: | IM TRYING TO FIND WHAT WE NEED. |
| Kabo Mccabe: | Levis supposed b bringing it |
| Miranda: | To where ? |
| Kabo Mccabe: | Bobs |
| Miranda: | So why wouldn't he bring ya in town? None of this make sense lol |
| Kabo Mccabe: | I have to go home |
| Miranda: | I know that Why would he bring it out there when I'm supposed to be picking u up |
| Kabo Mccabe: | Kailah called him |

Investigators believe that Miranda and Christopher McCabe were corresponding with each other in an effort to determine from where and who they were going to purchase narcotics. Twice Miranda references someone she knows who has "good shit" which, I know through training and experience, is a common way to talk about drugs that are of a good quality. Also, Christopher McCabe and Miranda reference a person named "Alan"; Christopher McCabe says he needs to go to Alan's house and Miranda says she thought $20 was going to Alan. Based on my training and experience, these messages, and my knowledge of this investigation, I believe Alan is Christopher McCabe's drug supplier. This message thread between Kabo Mccabe and Miranda continued on. The last message between Kabo Mccabe and Miranda was approximately 11:27 p.m., on April 1, 2020.

12.     During another the physical inspection of the cellular device, investigators observed conversations on Christopher McCabe's Facebook Messenger application (username Kabo Mccabe) having a conversation with an individual utilizing the username Alan.  Below is part of a several messaging thread between Kabo Mccabe and Alan, on April 1, 2020.

| | |
|---|---|
| Kabo Mccabe: | that china shit dangerous af |
| Alan: | Yea wouldn't kno fag |
| Kabo Mccabe: | U wouldn't wake up when I was there foo<br>I need sum go |
| Alan: | Stop it u can wake a ma fucker up or coulda jus left sum…<br>All kinds of optionsm.<br>I got sum.  I need sum slo |
| Kabo Mccabe: | been sleeping like 4ever<br>Shit im locked down till they go work<br>I don't got no way round tho<br>I owe mir shot outta this2 |
| Alan: | *thumbs up sign*<br>Yea so dead for me. Wven tho u was here n owe me.  Ats kool |
| Kabo Mccabe: | No if u want this I got ya b4 do car<br>Up to u |
| Alan: | Wat |
| Kabo Mccabe: | some slo<br>Isnt it dangerous to do china rite now anyways with corona coming from there |
| Alan: | Yea if it any good… Shut up.  It prolt no good anyways |
| Kabo Mccabe: | U cant gas me up.  Im still upset stomach from falling out yesterday |
| Alan: | Yas yea. Ur like a featherweight |
| Kabo Mccabe: | Bag gets me together fs |
| Alan: | yea proly not me |

| | |
|---|---|
| Kabo Mccabe: | It would |
| Alan: | We c I guess |
| Kabo Mccabe: | Sup |
| Alan: | Sup |
| Kabo Mccabe: | U ready come off them shoes |
| Alan: | U ready bring me sum money |
| Kabo Mccabe: | U got sum shit<br>I got ur funds |
| Alan: | Come on then |
| Kabo Mccabe: | Gots get ride |
| Alan: | Wete u ay |
| Kabo Mccabe: | Calico ridge |
| Alan: | Nice |
| Kabo Mccabe: | Fucc man<br>U good?<br>*called Alan* |
| Kabo Mccabe: | U cant grab cpl n I pay u when get here |
| Alan: | I'm broke as fuck |
| Kabo Mccabe: | I got u<br>Got ubag u got sitck? N ill grab my shoes later. |

Investigators believe that Alan and Christopher McCabe were corresponding with each other about a drug purchase. They discuss the quality of the "china," which, based on my training and experience, I know is a common drug term for heroin, by talking about how "dangerous" it is. He refers to it being dangerous because, the more potent a drug, such as heroin or fentanyl, the more likely it could cause death or serious bodily harm to the person who uses it. Christopher

McCabe specifically asks to purchase drugs from Alan by saying, "U got sum shit[?]" Christopher McCabe tells Alan that he has the money to buy the drugs when he says "I got ur funds", and Alan responds, "Come on then", indicating he is ready for Christopher McCabe to come over to purchase drugs. This message thread between Kabo Mccabe and Alan continued on. The first message started on April 1, 2020, at approximately 4:28 a.m. The last message between Kabo Mccabe and Alan was at approximately 11:19 p.m., on April 1, 2020.

13.     The last message that investigators observed on the Christopher McCabe cellular device was to Alan, via Facebook Messenger, on April 2, 2020, at approximately 9:01 a.m. Notably, Christopher McCabe was found unresponsive at approximately 2:09 p.m., on April 2, 2020.

14.     The above conversations between Christopher McCabe aka "Kabo Mccabe", Miranda, and Alan provide credibility to Kimberly McCabe's theory that Christopher McCabe used Facebook, a social media platform, to conduct his narcotics-related conversations. Investigators are not certain if Christopher McCabe deleted any of the messages in the Facebook Messenger application, so definitively having all of the information from Facebook would be beneficial. Moreover, based on evidence observed on Christopher McCabe's cellular device, it is believed that Christopher McCabe recently relapsed and has been purchasing illegal drugs since at least March 25, 2020. Ultimately, investigators believe attaining these records from Facebook will provide insight into who provided the narcotics to Christopher McCabe hours before his death and will possibly provide information about a drug trafficker who has been selling drugs to others for an extended period of time.

## INFORMATION ABOUT FACEBOOK

15.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

17.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A

Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are

typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

24.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

27.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a

Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

29. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

15

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

32.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

33.     Based on the foregoing, I request that the Court issue the proposed search

warrant.

34.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving it on Facebook.  Because the warrant will be served on Facebook, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.

35.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).


_Noah Bookman_

Noah Bookman
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me
this  24 day of June, 2020.


Kimberly A. Jolson
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID Kabo Mccabe / Facebook user ID number 100047166105046 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.  **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from March 1, 2020 through April 2, 2020;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from March 1, 2020 through April 2, 2020, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user from March 1, 2020 through April 2, 2020, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account from March 1, 2020 through April 2, 2020;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The sale of illegal drugs or the transfer of proceeds from the sale of illegal drug, to include any and all communications about and information regarding these crimes since March 1, 2020;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).